UNITED STATES of America

v.

John F. GOLE, Defendant.

No. 97–CR–28 (ERK).

United States District Court, E.D. New York.

Sept. 24, 1997.

Seth Marvin, Assistant United States Attorney (Zachary W. Carter, United States Attorney, E.D.N.Y.) Brooklyn, NY, for Government.

James O. Druker, Kase & Druker, Garden City, NY, for defendant.

## MEMORANDUM

KORMAN, District Judge.

John F. Gole was convicted of one count of mail fraud, 18 U.S.C. § 1341, after a jury trial. This was a classic mail fraud case in which the defendant conceded all of the essential elements of the offense. The defense that was offered was essentially one which appealed to the power of the jury to nullify. The Second Circuit recently observed that "no juror has a right to engage in nullification" and that "trial courts have the duty to forestall or prevent such conduct." *United States v. Thomas,* 116 F.3d 606, 616 (2d Cir.1997). The purpose of this memorandum is to place in context and to explain several rulings I made in the course of the trial that were made to prevent the defendant from achieving his goal.

The facts are simple. Mr. Gole retired from the Fire Department on October 10, 1988, with the rank of Firefighter 1st Grade, after he was found by a review board to have a disabling back injury. He was granted a pension of a little over $30,000 per year. Under New York law, a disability pensioner is allowed to earn money by other gainful employment even though disabled from fire-fighting duties. If he does so, however, his pension is reduced by the amount that the pension combined with his outside earnings had exceeded the "current maximum salary for the title next higher than that held by him ... when he ... was retired" for a given year. N.Y.C. Admin. Code §§ 13–356 & 13–357 ("Safeguard Provisions").

The Pension Bureau relies on annual reports of outside income by the pensioner in order to determine whether to reduce the pension for a particular year. Because the report of outside income is made after the pensioner has received his disability pension for that year, any amount earned over this "Safeguard Threshold" would be reimbursed to the City, through abatement of future pension payments, Tr. 185 (March 11, 1997), or by a negotiated schedule of repayments. Tr. 50, 75, 83 (March 10, 1997).

The case here turns on the outside income reports Mr. Gole filed for the years 1991, 1993, 1994. Apparently due to some bureaucratic glitch, the Pension Bureau did not send Mr. Gole and others similarly situated the outside income reporting forms at the end of each of the subject calendar years. Instead, it sent the forms for those years in early 1995. Mr. Gole concededly earned income as a steam fitter for those years. Mr. Gole knew that the amounts he actually earned, when combined with his pension, exceeded substantially what the Pension Bureau regarded as the "current maximum salary for the title next higher than that held by

him ... when he ... was retired," which was Lieutenant. But Mr. Gole held a different view of the maximum he was entitled to earn prior to triggering the Safeguard repayment obligation. Specifically, he claimed that he was entitled to outside earned income which, when combined with his pension, equaled the total earnings of *the* highest-paid Lieutenant in the Fire Department. This amount would vary from year to year because it includes not only the base salary but the overtime earned by that Lieutenant.[1]

Under his interpretation of the Safeguard Provisions, Mr. Gole's earned income was within permissible bounds and would not have triggered a retrospective recalculation of his pension benefits for the years in question. Because Mr. Gole was aware that the Pension Bureau did not accept this interpretation, he knew that filing truthful financial disclosure forms would have caused a recalculation, and that the only way to avoid this would have been litigation. Such litigation was a "hassle" that he wished to avoid. Accordingly, he deliberately filed false reports for the years 1991, 1993, and 1994 that understated his outside income by amounts that would bring his total income, outside plus pension, below the Pension Bureau's calculation of the Safeguard Threshold under the New York City Administrative Code. Specifically, the figures for actual and reported income were as follows:

| | Actual Income | Reported |
|------|---------------|----------|
| 1991 | $33,146.00 | 20,844.00 |
| 1993 | 52,791.00 | 23,866.00 |
| 1994 | 53,181.00 | 24,612.00 |

Mr. Gole also falsely listed his employer as a friend's bar/restaurant. Mr. Gole executed the forms for each of these years under the following certification:

> I am signing and aware that the report of wages, salaries, professional fees and other income I receive as compensation for personal services become a part of the record of the Pension Fund and that the Pension Fund issues retirement allowance checks for me in reliance on my accurate and complete reporting of such income. Furthermore, I understand that I am under a

duty to inform the Pension Fund of any mistakes I make on a financial disclosure immediately upon my discovery of such mistake and that incorrect report of my earnings may be a violation of the law and may result in withholding of my retirement allowance.

Tr. 103 (March 10, 1997).

These false statements led to the indictment of Mr. Gole along with a number of other disabled pensioners who had similarly filed false outside income reports. Mr. Gole's defense was that he entertained a good faith belief that the formula used by the Pension Bureau to calculate the Safeguard Threshold was wrong, and that his method was correct. Rather than litigate, he chose to adopt a kind of alternative dispute resolution mechanism by which deceit is used to preempt the dispute.

### Pre–Trial Motions and Trial

Just prior to the trial, the United States Attorney moved to preclude as invalid this "good faith" defense and to exclude evidence in support of it. At the argument of that motion and throughout the trial, the defendant admitted that he knew the income statements on the forms were false, that he made them for the purpose of retaining pension payments for the three years that he knew the Pension Bureau would have insisted he repay, and that he signed and mailed the reports. Tr. 4 (March 7, 1997).

Nevertheless, Mr. Gole argued that he did not intend to defraud the Pension Bureau, but to keep money that he in "good faith" believed was his due under a proper interpretation of the Safeguard Provisions. Tr. 8 (March 7, 1997). Mr. Gole would attempt to establish the subjective belief that he was entitled to the money by showing, through his testimony and through cross-examination of Milton DeRienzo, a Pension Bureau official, that the Lieutenant's salary was in fact improperly and arbitrarily calculated by DeRienzo, that he had in fact attempted to learn what "actual" Lieutenants were making, and that others such as Uniformed Fire-

---

1. There were some other increments, such as uniform allowance, that the Pension Bureau added to the base salary of the most senior Lieutenant to arrive at its figure. The major difference, however, was that the Pension Bureau formula did not add overtime.

fighters Association officials had told him that the calculation was erroneous. Tr. 8–9, 14 (March 7, 1997).[2] Defense counsel argued, however, that he did not have to prove that the calculations were incorrect. Instead, it was sufficient that Mr. Gole entertained a good faith belief that they were calculated incorrectly.

My first impression was that, although the defendant would be permitted to produce evidence of good faith, the proof offered was irrelevant here. Tr. 32 (March 7, 1997). At the end of the hearing, after I requested and listened to a detailed narrative of the defense theory, I finally ruled that the proposed evidence was wholly irrelevant, and as such would not be allowed and would not entitle defendant to a good faith charge. Tr. 55 (March 7, 1997).

Nevertheless, despite my ruling and my attempts to limit the jury's exposure to this irrelevant proof, there were many instances where counsel injected the propriety of the calculations and Mr. Gole's subjective "good faith" belief that he was entitled to the pension money into the jury's consciousness. Defense counsel argued these points throughout his opening, and he persistently attempted to cross-examine Mr. DeRienzo about the steps he took to calculate the threshold figure, even after I had listened to his entire cross-examination outside the jury's presence and ruled that this evidence was irrelevant. Tr. 130–85 (March 11, 1997). Moreover, testifying in his own behalf, Mr. Gole told the jury that he thought the threshold was improperly calculated, that union officials had told him it was, and that he lied on the forms to escape the effect of this artificial and improper calculation. Tr. 222–63 (March 11, 1997).

Although I had ruled that the defense was invalid, it was now clearly present in the case. Accordingly, at the end of defendant's testimony it was necessary to address the

Government's application to admit similar misstatements on a credit application to a bank, as evidence of fraudulent intent and to rebut the defendant's claim of good motive. Specifically, the defendant had submitted documents to Citibank in 1992, in support of an application to increase a credit line, which included both false representations about his earnings and a bogus "paycheck" that he had written for him. He used this same ruse, employment at the same friend's restaurant, when he filled out the Safeguard Provision forms.

This similar act tended to rebut the defendant on the issue of "good faith" that he had just amplified in his testimony. Because Mr. Gole's testimony regarding his subjective good faith was not relevant to any legal defense, it was apparent that his only purpose in offering it, along with testimony suggesting an otherwise admirable life and character, was the hope of jury nullification. Under these circumstances, it was important for the jury to have a complete picture of all the evidence relevant to this issue. As the Supreme Court observed in an analogous context, "the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault." *Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 654, 136 L.Ed.2d 574 (1997); *cf. United States v. Gilliam,* 994 F.2d 97, 101 (2d Cir.), *cert. denied,* 510 U.S. 927, 114 S.Ct. 335, 126 L.Ed.2d 280 (1993).[3] Moreover, because this similar act was an incident directly probative of truthfulness and not remote in time, it was also admissible to impeach under Rule 608(b). The only prejudice to the defendant was that it decreased the likelihood that the jury would impermissibly engage in nullification.

**2.** The latter testimony was ultimately excluded because the advice Mr. Gole allegedly received in this regard came after he filed the false forms. Tr. 232 (March 11, 1997).

**3.** As Mr. Gole's lawyer explained the effect of the similar act evidence:

"When I took a couple of people in my office and just laid out the case without anything and then I threw that [similar act] into them ... I just saw a cloud go over their faces, and the advice I was given was that that makes an immense difference."
Tr. 252 (March 11, 1997).

As anticipated, the summation of defense counsel, Mr. Druker, was almost completely based on the premise that Mr. Gole acted to combat the purportedly "erroneous" formula of Milton DeRienzo and the Pension Bureau, and, toward the end, on naked pleas for sympathy and nullification. Mr. Druker repeatedly reemphasized that the formula was based "upon Mr. DeRienzo's erroneous interpretation of what the actual law of New York State was that was supposed to govern it but somehow Mr. DeRienzo's interpretation winds up gaining the force of law." Tr. 403 (March 12, 1997). After a discussion contrasting Mr. DeRienzo's interpretation with the level of compensation of a "real" Lieutenant, Mr. Druker stated that DeRienzo "just went ahead and as Frank Sinatra said, did it my way." Tr. 406 (March 12, 1997). He continued, "Now, is this fair? I mean this is supposed to be fair but is it actually fair now that we are governed by DeRienzo's law?" Id.

Defense counsel also painted Mr. Gole as the victim of overzealousness on the part of the city and prosecutors:

And you know the bottom line is that if they had done this correctly and competently, that he wouldn't be called on to pay one cent to the City. . . . They came in here and he's being prosecuted and as you were told there is going to be a civil case, a follow-up, where they are going to go after him for the money as Mr. DeRienzo said, win lose or draw here. That shouldn't be the finishing point, ladies and gentlemen of the jury, that should have been the starting point. To determine who was right and who was wrong on the interpretation of those numbers. The union and the firefighters and the people who drafted the legislation; were they right or was Mr. DeRienzo right?

Tr. 407–08 (March 12, 1997). Finally, based on all of these arguments, Mr. Druker made his unmistakable plea for the jury to nullify:

Now, they are not going by the law. They are not even presenting you with the correct numbers, ladies and gentlemen. . . . They don't consider that he worked for every cent that he made. None of that. They say to you, well, he

lied on the forms. He sent it through the mail and his purpose was not to have to pay money to New York City and that's the end of the case and they ask you to make him a convicted felon based on that.

And what I'm asking you to say is in the words of the Former First Lady of the United States to paraphrase, not to paraphrase her, to quote her, just say no to this. It's wrong. It's unfair. It's improper. This man is not a criminal, ladies and gentleman of the jury[.]

Tr. 410–11 (March 12, 1997). Mr. Druker then hearkened back to Mr. Gole's distinguished military background, quoting Stephen Crane's "Red Badge of Courage" to ask that Mr. Gole not be forced to wear the "sore badge of his dishonor" through life. In closing, he asked that "this be fought out in the Civil Courts in New York City where it belongs, ladies and gentlemen, and I'm sure that based on everything here you are going to give it fair consideration[.]" Tr. 411 (March 12, 1997).

After the summations I instructed the jury on the elements of the offense of mail fraud. While I quoted the traditional boilerplate instructions on the defense of good faith, I added the following caveat over defense counsel's objection:

I want to caution you, however, that the defense of good faith is not available to a defendant who deliberately makes a representation that he knew to be false, even if the defendant reasonably believed that he was legally entitled to the money he was seeking to obtain by such a false representation. Accordingly, it is not relevant to your consideration of the guilt or innocence of the defendant whether the formula used to determine the allowable earnings cap, that is the amount he could earn in any year without loss of some of his pension, was correctly calculated, or whether defendant believed that it was wrongly calculated.

Tr. 430–31 (March 12, 1997).

## Discussion

█ I write this memorandum principally to more fully set forth my reasons for precluding defendant's purported "good faith"

defense and for charging the jury as I did. The "good faith" defense was nothing of the kind, and did not even compel the jury instruction I gave. As a matter of law, it was not a defense at all. Only my solicitude for the right of a testifying defendant to tell the jury his complete story kept me from more aggressively barring proof of this spurious claim from the case.

 It is axiomatic that good faith is a complete defense to a charge of mail fraud, and that the prosecution bears the burden of disproving good faith beyond a reasonable doubt. *United States v. Alkins*, 925 F.2d 541, 550 (2d Cir.1991). The good faith defense, for lack of a more precise term, that the Second Circuit has approved in the context of mail fraud focuses on (1) "a corporate agent who in good faith believes that his or her (otherwise legal) misleading or inaccurate conduct [to his employer] is in the corporation's best interests", *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir.1994),[4] or (2) on a defendant's "honest belief in the truth of ... representations made ..., however inaccurate the statement may turn out to be." *Alkins*, 925 F.2d at 550; *see* 1A Sand, et al., Modern Federal Jury Instructions, ¶ 44.01, at 44–29, 44–35 ("Sand ¶ __"). A number of caveats to this second variant have grown up in the cases. The definition of good faith

> addresses the defendant's belief in the truth of the representations, and not the defendant's belief as to the ultimate success of the plan.... Similarly, it is no defense that the defendant may have been legally entitled to the money or property if he or she used fraudulent means to insure its receipt.

Sand ¶ 44.01, at 44–35 (collecting cases). These caveats make it plain that the focus of the good faith defense is on the representations made by the defendant, and on the intent with which the he made them. They do not avail the defendant here.

Mr. Gole knew that, if he filed accurate disclosure forms, the Pension Bureau would recoup the excess pension paid by resorting to the self-help of docking further pension payments to him or requiring that he enter into a repayment plan that would have the same effect. This is a paradigmatic scheme to defraud; the defendant aimed to obtain or retain money by use of misrepresentations that he knew were material to the Pension Fund's decision on the amount due him.

 Nor did the defense here implicate the distinct issue under Second Circuit case law which turns on the materiality of the defendant's false statements and on his knowledge of their materiality. Specifically, the Second Circuit has made clear that even deliberately false statements do not suffice to prove intent to defraud unless they are more than marginally material to "ultimate value of the transaction." *United States v. Dinome*, 86 F.3d 277, 284 (2d Cir.1996); *In re Seizure of All Funds*, 68 F.3d 577, 581 (2d Cir.1995). Under this line of cases, a scheme to induce someone to purchase property at fair value is not a scheme to defraud merely because the defendant intended to persuade the purchaser to act by false statements not going to the issue of the "ultimate value" of the sale. Accordingly, a fraud does not "exist in a commercial transaction when the customer gets exactly what he expected and at the price he expected to pay." *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir.1970); *see United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir.1994) (reversing a conviction where a jury, not properly instructed as to materiality, could have found that the decision to deal with a defendant by a victim of that defendant's omission was affected in a way unrelated to value), *cert. denied, Johnsen v. United States*, 513 U.S. 1084, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995).

 The principle underlying these cases does not avail the defendant here. The record is undisputed that the false statements went to the heart of the Pension Fund's decision on the amount of pension due Mr. Gole, that he knew this to be the case, and that he acted to what the Pension Bureau

---

4. Mr. Gole conceded that the false statements were not "otherwise legal," because they violated New York law. Tr. 7 (March 10, 1997). Nor did he argue that they were in the "best interests" of the Pension Bureau.

would have understood to be its detriment. Whether the Pension Bureau's calculation of the Safeguard Threshold was correct,[5] or whether Mr. Gole entertained a good faith belief that it was incorrect, is not consequential. As the Second Circuit wrote in *Regent:*

> [A] wrong has been suffered when a man is deprived of his chance to bargain "with the facts before him" where the absent facts are material to the bargain he is induced thereby to enter.

421 F.2d at 1182 (quoting *United States v. Rowe,* 56 F.2d 747, 749 (2d Cir.) (Hand, J.), *cert. denied,* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932)). "Thus, 'the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution.' " *United States v. D'Amato,* 39 F.3d at 1257 (quoting *United States v. Wallach,* 935 F.2d 445, 462–63 (2d Cir.1991)). This is precisely the case here.

■ While the foregoing discussion addressed the special instruction that the jury was given regarding the good faith defense, there is one additional matter regarding the charge that requires some brief discussion. In instructing the jury on the elements of the crime of mail fraud, I declined to instruct the jury that it had to find that the defendant "willfully" devised a scheme to defraud. Specifically, I defined a scheme to defraud for the jury as follows:

> A scheme to defraud is a plan or course of conduct by which a person seeks to obtain money or property of another by making a false representation or claim, which was known to be false by the person making it or causing it to be made, with the intent to deceive another. The fraudulent representation or statement must relate to a material fact.

Tr. 428 (March 12, 1997). I then instructed the jury that a guilty verdict would be justified only if it was satisfied beyond a reasonable doubt "that the defendant knowingly devised or participated in the scheme [to defraud], with the specific intent to defraud." *Id.* at 429. After defining "knowingly" as a voluntary and deliberate act, I instructed the jury that "[i]ntent to defraud means to act knowingly and with the specific intent to deceive, for the purpose of obtaining money from another, including an agency of the local government." *Id.* at 430.

I chose not to use the word "willfully" because it would have allowed the defendant to play on the misleading language of the traditional boilerplate instruction. "Willfully" appears nowhere in the mail fraud statute, and the Second Circuit has expressly held that the only scienter requirement for a violation of § 1341 is that the acts proscribed be carried out "knowingly." *United States v. Precision Medical Laboratories, Inc.,* 593 F.2d 434, 443 (2d Cir.1978). Nevertheless, invocation of the word "willfully" in mail fraud instructions has, over time, become widespread. *See* 1A Sand ¶ 44.01, at 44–28 (model instruction reads that "the defendant participated in the scheme to defraud knowingly, willfully and with the specific intent to defraud"). "Willfully" is then defined as follows:

> "Willfully" means to act knowingly and purposely, with an intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law.

*Id.* This is precisely the definition the defendant sought here. Tr. 366 (March 12, 1997).

While I have given the "bad purpose to disobey or disregard the law" charge on numerous occasions, even where willfulness is not an element of the offense, it has never been precisely clear to me what thought it was intended to convey. Instead, it appears to be little more than a confusing amalgam of the various definitions of the word willful "when used in a criminal statute." *See United States v. Murdock,* 290 U.S. 389, 394–5, 54 S.Ct. 223, 78 L.Ed. 381 (1933).[6] Perhaps for

---

**5.** Short of an admission by the Pension Bureau, this was not an issue for the jury even if it was otherwise relevant. Mr. Gole never attempted to establish the point either in a prior collateral proceeding or by asking me to rule on it here.

**6.** In *United States v. Murdock,* the Supreme Court observed that, "when used in a criminal statute, it generally means an act done with a bad purpose; without justifiable excuse; stubbornly, obstinately, perversely. The word is also employed to characterize a thing done without a

this reason, the Second Circuit has cautioned against the use of stock language relating to mens rea and has suggested that "a more useful instruction might relate specifically to the mental state required under the pertinent statute and eschew use of difficult legal concepts". *United States v. Golitschek,* 808 F.2d 195, 201 n. 2 (2d Cir.1986). This is the directive I endeavored to follow here.

ground for believing it is lawful, or conduct marked by careless disregard whether or not one has the right so to act." *Id.* at 394, 54 S.Ct. 223 (citations omitted). Subsequently, in *Screws v. United States,* 325 U.S. 91, 101, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the Court noted that " 'wilful' is a word of many meanings, its construction often being influenced by context." See e.g. *United States v. Gabriel,* 125 F.3d 89, 100-102 (2d Cir.1997).