**UNITED STATES of America,**

v.

**Stuart SOMERSTEIN and Marianna Somerstein, Defendants.**

**No. CR 96–657(ADS).**

United States District Court,
E.D. New York.

July 21, 1997.

10. This court used the standard interest rate of 9% specified in C.P.L.R. Section 5004.

Zachary W. Carter, United States Attorney, Garden City, NY by Bradley Simon, Assistant United States Attorney, for U.S.

Stillman & Friedman, New York City (Charles A. Stillman, Andrew D. Kaizer, Rebecca Stead, of counsel), for Defendant Stuart Somerstein.

Newman & Schwartz, New York City (Gustave H. Newman, Annemarie Hassett, Steven Y. Yurowitz, of counsel), for Marianna Somerstein.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The defendants, Stuart Somerstein ("Stuart") and Marianna Somerstein ("Marianna," collectively the "Somersteins" or the "defendants"), the officers and principals of Somerstein Caterers of Lawrence, Inc. ("Somerstein Caterers" or "SCLI") were convicted after a jury trial of: (1) conspiracy; (2) mail fraud; and (3) filing false benefits reports. In addition, Stuart Somerstein was convicted of embezzling $155,000 from an employee benefit plan. The original indictment also charged Sylvia Bromley ("Brom-

ley"), SCLI's former bookkeeper, and John Iacovetti ("Iacovetti"), SCLI's former manager, with related crimes. Bromley passed away before the trial commenced and the indictment against her was dismissed. John Iacovetti was acquitted on all counts.

Presently before the Court are the motions by the Somersteins for a judgment of acquittal, pursuant to Fed.R.Crim.P. 29, or in the alternative, for a new trial pursuant to Fed. R.Crim.P. 33.

### I. *Background*

The evidence introduced by the Government at the trial demonstrates the following facts. Somerstein Caterers is a New York Corporation engaged in the catering business. As part of this enterprise, SCLI employs waiters, waitresses, bartenders, cooks, dishwashers, limousine drivers and security and maintenance personnel. Stuart Somerstein is the president of Somerstein Caterers. Marianna Somerstein, Stuart's wife, is vice president. As stated above, Bromley, who is now deceased, was SCLI's bookkeeper. Iacovetti was the general manager until 1993.

Somerstein Caterers employs both union and nonunion employees. These employees are also called "waitstaff." During the trial, the term "waitstaff" was defined as waiters, bartenders, captains and head waiters. Tr. 2184. The union employees are represented by the Hotel Employees and Restaurant Employees International Union, AFL–CIO ("HEREIU"), a labor organization whose members work in the culinary and hotel industries. Local 100 is the regional HEREIU chapter which includes as members restaurant and catering hall employees in the New York metropolitan area, including Long Island ("Local 100" or the "Union"). At all relevant times, Somerstein Caterers was a signatory to collective bargaining agreements with Local 100.

On June 1, 1987, the "1987 collective bargaining agreement" between SCLI and Local 100 went into effect. Articles IX, XII and XIII of the 1987 collective bargaining agreement required the following benefit contributions be made to various employee benefit funds ("Benefit Funds" or "Funds"):

| Fund | Amount of contributions |
|------|-------------------------|
| Vacation Fund | $5.00 per employee per party |
| Welfare Fund | $5.00 per employee per party |
| Pension Fund | $2.00 per employee per party |

On June 30, 1990, the parties entered into renegotiated collective bargaining agreement. Under this "1990 collective bargaining agreement," the required contributions as set forth in Articles IX, XII and XIII were as follows:

| Fund | Amount of contributions |
|------|-------------------------|
| Vacation Fund | $5.00 per employee per party |
| Welfare Fund | $5.00 per employee per party |
| Pension Fund | $5.00 per employee per party |

Consistent with the terms of both the 1987 and 1990 collective bargaining agreements, Somerstein Caterers filed monthly documents called "remittance reports" with the Benefit Funds. These reports were also referred to by other names. The reports set forth the number of jobs worked by each employee, the names and social security numbers of the employees and the contributions made on their behalf. In order to keep track of contributions, the Funds maintain member history reports, which include the number of jobs worked and contributions made by an employer over a specific period of time.

The information contained in these remittance reports is certified by the Benefit Funds in Internal Revenue Form 5500, which is filed annually with the federal government. According to the prosecution, the collective bargaining agreements required that the remittance reports contain the necessary information and contributions to provide benefits for both union and nonunion employees.

On November 1, 1980, prior to the execution of these collective bargaining agreements, Somerstein Caterers established the "Somerstein Caterers of Lawrence, Inc. Pension Plan" (the "Private Pension Plan"). The Private Pension Plan was developed for employees not covered by the HEREIU Benefit Funds.

According to the Government, based on information obtained from audits of Somerstein Caterers, and documents seized during a search, between 1987 and May 1994 the Somersteins conspired to defraud the Local 100 Benefit Funds by failing to pay contributions. As part of this scheme the defendants allegedly made false statements and false representations in the remittance reports filed with the Benefits Funds. The prosecution contends that the defendants would intentionally fail to make the required contributions, either by not listing certain employees on the reports or by not reporting all of the parties they catered. In addition, the Government maintains that Stuart Somerstein, acting in his capacity as a trustee, caused the Private Pension Plan to make two loans in the total amount of $155,000 to Somerstein Caterers. According to the prosecution, these transfers constitute both a "prohibited transaction" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, and constitute an embezzlement.

The indictment was filed on July 23, 1996 charging all the defendants with conspiracy, mail fraud, and filing false statements with the Benefit Funds. In addition, Stuart Somerstein was charged with embezzlement. The trial commenced on April 8, 1997 and continued for three and one-half weeks. On April 29, 1997, at the close of the Government's case, the Court granted the defendants' motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29, in part, dismissing those portions of the indictment alleging criminally fraudulent conduct in connection with Somerstein Caterers' failure to make benefit contributions for nonunion employees. On May 3, 1997, the jury returned a verdict convicting the defendants Stuart Somerstein and Marianna Somerstein of conspiracy, mail fraud and filing false documents. Stuart Somerstein was also convicted of embezzling funds. The defendant, John Iacovetti was acquitted of all charges.

As set forth above, the Somersteins have each filed separate motions for judgment of acquittal pursuant to Fed.R.Crim.P. 29(a), or in the alternative, for a new trial pursuant to Fed.R.Crim.P. 33.

## II. *Discussion*

### A. *Rule 29 standard*

Federal Rule of Criminal Procedure 29(a) provides that:

The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Federal Rules of Criminal Procedure 29(b) provides:

The Court may reserve decision on a motion for judgment of acquittal, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict. If the court reserves the decision, it must decide the motion on the basis of evidence at the time the ruling was reserved.

The standard for deciding a Rule 29 motion is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979); *United States v. Writers & Research, Inc.*, 113 F.3d 8, 11 n. 3 (2d Cir.1997); *Accord United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir.1994). "[A]ll reasonable inferences are to be resolved in favor of the prosecution (after a conviction) and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense." *Writers & Research*, 113 F.3d at 11 n. 3, quoting, *United States v. Artuso*, 618 F.2d 192, 195 (2d Cir.1980); *see United States v. Dinome*, 86 F.3d 277, 285 (2d Cir.1996). A defendant's burden in challenging a conviction on sufficiency grounds is a " 'heavy' " one. *United States v. McDonough*, 56 F.3d 381, 388 (2d Cir.1995); *D'Amato*, 39 F.3d at 1256, quoting, *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990).

A conviction may be based "solely on reasonable inferences from circumstantial evidence. . . ." *United States v. Pinckney*, 85 F.3d 4, 7 (2d Cir.1996), citing, *United States v. Fermin*, 32 F.3d 674, 678 (2d Cir.), *cert. denied*, 513 U.S. 1170, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1995). A conviction may not however, "rest on mere speculation or conjecture." *Pinckney*, 85 F.3d at 7, citing, *D'Amato*, 39 F.3d at 1256. The prosecution is obligated to do more than introduce evidence " 'at least as consistent with innocence as with guilt.' " *D'Amato*, 39 F.3d at 1256, quoting, *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir.1991).

### B. *Rule 33 standard*

Federal Rule of Criminal Procedure 33 provides that "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." Such a motion must be made within seven days of the verdict or within such time as the court may fix during this seven day period. *Id.* Under Rule 33, the trial court has broad discretion to set aside a jury verdict and order a new trial "to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir.1992). When reviewing a motion for a new trial, the court may weigh the evidence and evaluate the credibility of the witnesses. *See Tibbs v. Florida*, 457 U.S. 31, 37–38, 102 S.Ct. 2211, 2215–16, 72 L.Ed.2d 652 (1982); *Sanchez*, 969 F.2d at 1413; *United States v. Thomas*, 894 F.Supp. 58, 63 (N.D.N.Y.1995). The burden underlying a motion for a new trial is less stringent than that for a judgment of acquittal because, under Rule 33, the trial court has more latitude to assess the value of the evidence. *See Tibbs*, 457 U.S. at 38 n. 11, 102 S.Ct. at 2216 n. 11.

### C. *Sufficiency of the Evidence*

As set forth above, the Somersteins were convicted of: (1) conspiracy pursuant to 18 U.S.C. § 371; (2) mail fraud pursuant to 18 U.S.C. § 1341; and (3) submitting false remittance reports pursuant to 18 U.S.C. § 1027. In addition, Stuart Somerstein was convicted of embezzling $155,000 from an employee pension plan pursuant to 18 U.S.C. § 664.

The Somersteins attack the verdict on all counts as insufficient. Initially, the defendants assert that the Government has failed to produce sufficient evidence of knowledge and fraudulent intent to support any of the convictions. In addition, Marianna moves for reconsideration of the Court's decision with respect to the defendants' prior Rule 29 motion for the reasons set forth in the April 29, 1997 memorandum of law. For the sake of clarity, the Court will address the substantive counts of mail fraud and making false statements before considering the conspiracy conviction.

### 1. *Mail fraud*

■ Mail fraud is governed by 18 U.S.C. § 1341. To sustain a mail fraud charge the Government must prove beyond a reasonable doubt: the defendants' knowing and willing participation in a scheme or artifice to defraud, to obtain money or property, and use of the mails in furtherance of the scheme. *United States v. Sawyer,* 85 F.3d 713, 723 (1st Cir.1996); *United States v. William Savran & Assocs.,* 755 F.Supp. 1165, 1180 (E.D.N.Y.1991). A conviction requires a showing of specific intent to defraud. *Sawyer,* 85 F.3d at 723; *United States v. Gelb,* 700 F.2d 875, 879 (2d Cir.), *cert. denied,* 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983). Further, " '[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he causes the mails to be used.' " *United States v. Alkins* 925 F.2d 541, 549 (2d Cir.1991), quoting, *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954). However, the Second Circuit has recognized:

> The scheme to defraud need not have been successful or complete. *Durland,* 161 U.S. at 315, 16 S.Ct. at 512; *Starr,* 816 F.2d at 98. Therefore, the victims of the scheme need not have been injured. *United States v. Andreadis,* 366 F.2d 423, 431–32 (2d Cir.1966), *cert. denied,* 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). However, the government must show "that some actual harm or injury was *contemplated* by the schemer." *Regent Office*

*Supply Co.,* 421 F.2d at 1180; *see also United States v. Mittelstaedt,* 31˙ F.3d 1208, 1216 (2d Cir.1994); *Starr,* 816 F.2d at 98; *United States v. London,* 753 F.2d 202, 206 (2d Cir.1985).

Because the defendant must intend to harm the fraud's victims, "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *Starr,* 816 F.2d at 98. "Instead, the deceit must be coupled with a contemplated harm to the victim." *Id.* In many cases, this requirement poses no additional obstacle for the government. When the "necessary result" of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself. *Regent Office Supply Co.,* 421 F.2d at 1181 (quoting *Horman v. United States,* 116 F. 350, 352 (6th Cir.), *cert. denied,* 187 U.S. 641, 23 S.Ct. 841, 47 L.Ed. 345 (1902)). Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent. *See, e.g., Starr,* 816 F.2d at 98–99. *D'Amato,* 39 F.3d at 1257.

"Good faith" is a "complete defense" to a mail fraud charge. *Alkins,* 925 F.2d at 549. "If an individual believes that the information set forth in a mailing is true, it follows that he cannot have the requisite intent to defraud. The government must prove lack of good faith beyond a reasonable doubt," as was charged in this case. *See id.* at 550.

Applying these standards, the Court finds that the Government has supplied sufficient evidence of mail fraud to sustain the convictions under Count II. We start this analysis with the evidence that the defendants mailed remittance reports to the HEREIU Funds which understated their obligations and systematically omitted numerous entire catered parties.

There is substantial evidence in the record of the defendants' intentional failing to report large numbers of entire catering parties. Paul Tronsor is a bartender and a member of the Union. During an intermittent five month period he worked a total of 73 jobs, but only 33 were reported so that the defen-

dants failed to report 40 jobs worked by Tronsor during that five month period.

Also, in 1987, 50 of the 118 jobs worked by Tronsor were unreported. In 1988, 51 of 119 Tronsor jobs were unreported. In 1990, 61 of 140 jobs by Tronsor were unreported, and in 1991 55 of 130 jobs were unreported. So that in five years, between 1987 and 1991, a total of 273 jobs performed by Tronsor were not reported, and the employee benefit fund contributions for those jobs were unpaid. *See* Gov. Ex. 114, 114A.

Vincent Lucci is a union member and bartender who was hired by Somerstein Caterers on July 1, 1982 and worked for Somerstein for approximately ten years. For the five years from 1987 through 1991, 261 of the jobs he worked were not reported. *See* Gov. Ex. 115A.

David Smith is a union waiter, who was still employed by Somerstein Caterers at the time of the trial. During four years of his employment, namely 1987, 1988, 1989 and 1990, 177 of his jobs were not reported to the Union. This constituted more than 40 percent of the total jobs he worked for Somerstein Caterers during that period of time. *See* Gov. Ex. 116A.

Helen Ceglia is a Special Agent for the United States Department of Labor, Office of Labor and Racketeering. On October 18, 1994, along with other agents, she conducted a search of the Somerstein Caterers offices pursuant to a search warrant. Boxes of records were seized. From these records Ceglia prepared certain charts regarding affairs at Somerstein Caterers during the year 1991. A portion of her testimony is as follows:

Q Can you tell us what Government's Exhibit 305A is?

(Handed to the witness.)

A It is a list of 61 affairs that took place at Somerstein Caterers from January through December 1991.

Q This is one-half of the document; is that correct?

A Yes.

Q And let me show you Government's Exhibit 305B; and ask if this is the second part of Government's Exhibit 305?

A Yes.

Q Can you tell us what Government's Exhibits 305A and 305B are?

A A list of the affairs that took place at Somerstein Caterers in 1991. The first column shows the date of the affair. The second column shows the affair name. The third column is headed remittance mail to HEREIU Benefit Funds, and down both columns for all 61 affairs, it says no. And the fourth column indicates that each of these affairs took place.

MS. WARD: The government offers Government's Exhibits 305A and 305B.

THE COURT: Any objection?

MR. STILLMAN: No objection.

MR. NEWMAN: No objection.

THE COURT: 305A and 305B for Baker in evidence.

(Government's Exhibits 305A and 305B received in evidence.)

Q With regard to the remittances mailed to HEREIU, the third column over, what did you rely on in determining that these were not filed?

A I relied on Exhibit 40, the remittances filled out and not mailed in.

MS. WARD: And it was agreed by the parties, your Honor, that all the affairs that appear on 305A and 305B actually did take place.

THE COURT: Is that stipulated to?

MR. STILLMAN: Yes, your Honor.

MR. NEWMAN: So stipulated.

MR. BERGMAN: Yes, your Honor.

Tr. 2783, 2784.

Independent evidence of fraudulent intent may be inferred from a plethora of evidence. Stuart's knowledge of Somerstein Caterers' duty to pay contributions may be inferred from his signing of the collective bargaining agreements. *See* Gov. Ex. 2, 3, 4. His desire to avoid union obligations is evidenced by the testimony of Robert Kanowitz. Tr. 1140–42. In addition, during a meeting with the union in January 1993 to address SCLI's obligations under the collective bargaining agreement, Stuart's only response was that

"he would think about it." Tr.2020. According to Paul Tronsor, a bartender and the Union shop steward, Marianna Somerstein was present at that time. *Id.*

Further independent evidence of this fraudulent scheme is found in Marianna's conduct with respect to the remittance reports. Marianna was responsible for determining how many union employees worked at each affair and there is some evidence that she oversaw the remittance reports. Tr. 588–90, 593, 1677; Gov. Ex. 44(i). The remittance reports served as the basis for determining the appropriate amount of contributions. While Marianna served SCLI in this capacity, the remittance reports omitted large numbers of catering parties, and many did not incorporate all the hours worked by union employees. *See* Gov. Ex. 114, 114A, 115, 115A, 116, 116A, 304, 305. In the Court's view, any reasonable jury could have found the essential elements of mail fraud based on the intentional, systematic false reporting of union employees at parties, beyond a reasonable doubt. Accordingly, the defendants' Rule 29 motions for judgment of acquittal are denied with respect to the mail fraud convictions.

In reaching this conclusion the Court distinguishes *United States v. D'Amato*, 39 F.3d 1249 (2d Cir.1994), cited by Stuart Somerstein. In *D'Amato*, the defendant, Armand D'Amato, brother of United States Senator Alphonse D'Amato, was convicted of mail fraud. The conviction was based on an alleged scheme to contract with the Unisys Corporation to provide written reports on United States Senate proceedings while intending not to produce those reports. The Second Circuit reversed the convictions reasoning that the Government did not produce any evidence of criminal intent, and that demonstration of a mere "breach of contract does not amount to mail fraud." *Id.* at 1261 n. 8.

As set forth above, the Government adduced evidence of the defendants' fraudulent intent in the intentional and systematic failure to report numerous entire catering parties in violation of a criminal statute designed to protect employee benefit funds. In addition, Marianna monitored the completion of the remittance reports and both she and Stuart signed the checks that were payable to the Funds. This is no mere breach of contract. The proof shows that there was an intentional failure to make the required contributions in violation of a statute imposing criminal liability for such conduct.

### 2. *False statements*

A charge of making false statements and concealment of facts with respect to an ERISA plan is governed by 18 U.S.C. § 1027 which provides:

> Whoever, in any document required by title I of [ERISA] to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years or both.

18 U.S.C. § 1027.

■ The statute, which applies equally to plan fiduciaries and employers, *United States v. S. & Vee Cartage Co.*, 704 F.2d 914 (6th Cir.1983), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983), requires the Government to demonstrate that: (1) the defendant made a false statement or representation of fact, or concealed, covered up, or failed to disclose a fact; (2) that the defendant did so knowingly; (3) that the false statement or representation of fact was made in a document required by ERISA to be kept as part of the records of an employee benefit plan; and (4) that the plan in question was an employee benefit plan under ERISA. *United States v. Martorano*, 596 F.Supp. 621, 624–25 (E.D.Pa.1984), *aff'd*, 767 F.2d 63 (3d Cir.1985), *cert. denied*, 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985). Section 1027 applies to remittance reports. *See id.*

The defendants contend that the remittance reports, which are the basis for the false statement convictions, are not documents within the purview of section 1027. The Court disagrees. The testimony of several witnesses clearly established that the remittance reports were the type of document contemplated by section 1027. Phyllis Line, the General Manager of HEREIU testified as follows:

Q  Could you tell us what Government's Exhibit 20 is.

A  Again, this is the monthly remittance reports submitted by the employer which outlines the names and Social Security numbers for who the employee is working during—for the employees working during that month.

Q  Are these reports maintained in the regular course of business?

A  Yes, they are.

    \*     \*     \*     \*     \*     \*

Q  Can you tell us the first several pages?

A  The first several pages are the listing of employees who work specific jobs during the month of June. They all have various dates which I assume are the dates when the function took place.

Tr. 382, 383.

Although different names were used for the forms that the employer had to mail with the contributions to the Benefit Funds, the term "remittance report" is probably the most commonly used. As Phyllis Line testified:

THE COURT: You didn't use the words "remittance forms". Do you use those forms.

THE WITNESS: Your Honor, we use several words, billing—

THE COURT: Remittance forms are proper to use for these documents?

THE WITNESS: Yes, your Honor.

THE COURT: Just as the ones we saw yesterday?

THE WITNESS: Yes, your Honor.

THE COURT: All right.

    \*     \*     \*     \*     \*     \*

Q  The information contained in Government's Exhibit 104 and 101 that you have up there, the typed or computer like information, where does that information come from initially?

A  From the employer reports, the remittance reports.

Q  So, the typed information comes from what would be submitted by Somerstein Caterers on what we have been calling remittance reports, and they have had other names; correct?

A  Yes.

Tr. 403, 537, 538.

Also, William Holland, a CPA auditor for HEREIU testified as follows:

Q  Do you recognize Government's Exhibit 306?

A  I do.

Q  What type of document is it?

A  This is what we would call a remittance report that employers sends [sic] to the Fund with employee work history data and a check for the compensation that is due, contribution that is due based on the amounts and people who are recorded on this report.

Tr. 2657, 2658. Spencer Hobson, also an auditor for HEREIU, who conducted audits of Somerstein Caterers, testified as follows:

Q  Other than the remittance reports, is there any other form that an employer contributor sends to the Fund to account for the number of jobs that are worked by an individual employee?

A  Not that I am aware of.

Tr. 1105.

Holland gave further significant testimony as follows:

Q  Do remittance reports factor into the preparation of 5500 tax reports?

A  Yes, they do. They are—

MR. NEWMAN: Objection. Asked and answered.

THE COURT: The question is do remittance reports, what was the question now?

MR. STILLMAN: Factor into.

MS. WARD: A big word for me, factor into.

THE COURT: Thank you. Into preparing these reports.

A  Yes, very important.

Q  How are they important?

A  They are the basis for contribution income reported on a 5500, because this report like all remittance reports that come to the Fund are compiled into the books of the Fund and they get reported on a Form 5500 as contribution income.

\*    \*    \*    \*    \*    \*

Q  So, just to summarize, these forms are used in the preparation of the forms 5500s by your form [sic]?

A  Yes, they are in the sense they are part of the audit, and they are reviewed and checked on and become part of the audit procedures that we performed. And they are part of the financial statements of the Fund, and reported on a 5500.

Tr. 2660, 2661.

The Court previously addressed the subject of the remittance report in the decision rendered at the close of the Government's case:

> This is a classic document required to be filed by the employer. It is the only one. Without these documents the union could not, except by independent audits. And why do they have to have independent audits when the collective bargaining agreements, every one of them, provide that the employer must file monthly statements both as to the Pension and Welfare Fund, and also the Vacation Fund. The agreement provides for it. It is the method by which the union relies upon to report to the government. And it is in my view classically included in Section 1027. · And the only courts to rule on it agree with me.
>
> United States v. S. & Vee Cartage Co. Inc., 704 F.2d 914.

Tr. 2962.

■ "[T]he term 'knowingly' requires proof of a voluntary, conscious failure to disclose without ground for believing that such non-disclosure is lawful or with reckless disregard for whether or not it is lawful." *United States v. Tolkow,* 532 F.2d 853, 858 (2d Cir.1976); *accord Martorano,* 596 F.Supp. at 625 ("Proof of specific intent is not required to establish a violation of § 1027"). Section 1027 "does not require actual knowledge of its obligations" to sustain a conviction. *Tolkow,* 532 F.2d at 858.

The Court notes that Marianna Somerstein seeks to have the Court reconsider its earlier decision denying defendants' prior Rule 29 motion with respect to the charges based on the filing of false statements. *See* Tr. 2921–28. This motion was based on the ground that section 1027 does not apply to remittance reports, and that *Martorano* and *S & Vee Cartage* were wrongly decided despite the absence of relevant case law to the contrary. The Court grants the motion for reconsideration and, upon reconsideration of all the relevant arguments, including the evidence set forth above regarding the importance of the remittance reports to the Benefit Funds process, following these precedents, it adheres to its original decision.

■ Applying the standards set forth above, the Court finds that any rational trier of fact could have found the essential elements of this crime, namely filing false statements in the form of remittance reports, beyond a reasonable doubt. The Government has presented substantial evidence that the defendants violated 18 U.S.C. § 1027, beyond a reasonable doubt. Articles IX, XII and XIII of the collective bargaining agreements, signed by Stuart Somerstein, obligate SCLI to pay benefit contributions to the Funds. The defendants were obviously aware of this obligation as they filed monthly remittance reports for their union employees. However, these reports, upon which the Union relied when assessing contributions owed, and to report to the IRS, omitted hundreds of catered parties at which union employees worked and omitted hours worked by union employees at reported parties. Tr. 895–96, 911–45, 995, 1104–05; Gov. Ex. 114, 114A, 115, 115A, 116, 116A, 304, 305. Accordingly, the defendants' motions for a judgment of acquittal with respect to Count III are denied.

### 3. Conspiracy

■ The charge of conspiracy is governed by 18 U.S.C. § 371, which provides, in relevant part:

> If two or more persons conspire to either commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more or such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371.

Conspiracy constitutes a crime, separate and distinct from the substantive offense. *See United States v. Feola,* 420 U.S. 671, 693–94, 95 S.Ct. 1255, 1268–69, 43 L.Ed.2d 541 (1975). The Second Circuit has recognized that in order to establish the crime of conspiracy, the following elements must be shown: (1) an agreement among the conspirators to commit the offense; (2) specific intent to achieve the objective of the conspiracy; and (3) usually an overt act in furtherance of the conspiracy. *Pinckney,* 85 F.3d at 8. Although the Government need not establish commission of the substantive offense or that the participants in the conspiracy knew all of the relevant details, the defendants' intended future conduct must contemplate all the elements of the substantive crime. *Id.,* citing, *United States v. Rosa,* 17 F.3d 1531, 1543 (2d Cir.), *cert. denied,* 513 U.S. 879, 115 S.Ct. 211, 130 L.Ed.2d 140 (1994); *United States v. Rose,* 590 F.2d 232, 235 (7th Cir.1978), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979).

Although conspiracy is a specific intent crime, *see United States v. Gaviria,* 740 F.2d 174, 183 (2d Cir.1984), it is by its nature "a secretive operation." *United States v. Provenzano,* 615 F.2d 37, 45 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980). In proving the existence of an agreement, the Government need not present evidence of a formal understanding between the co-conspirators. *United States v. Montour,* 944 F.2d 1019, 1025 (2d Cir. 1991); *United States v. Wardy,* 777 F.2d 101, 107 (2d Cir.1985), *cert. denied,* 475 U.S. 1053,

106 S.Ct. 1280, 89 L.Ed.2d 587 (1986). Instead, the agreement can be inferred from the facts and circumstances of the case. *Iannelli v. United States,* 420 U.S. 770, 777 n. 10, 95 S.Ct. 1284, 1290 n. 10, 43 L.Ed.2d 616 (1975); *United States v. Amiel,* 95 F.3d 135, 144 (2d Cir.1996). As the Second Circuit recognized in *Amiel:*

> a tacit understanding will suffice to show agreement for purposes of a conspiracy conviction. There need not be any written statement or even a speaking of words which expressly communicates agreement. Furthermore, the participants in a conspiracy need not be fully aware of the details of the venture so long as they agree on the essential nature of the plan. Finally, evidence sufficient to link a particular defendant to a conspiracy need not be overwhelming, and may be demonstrated by circumstantial evidence.

*Amiel,* 95 F.3d at 144 (internal quotations and citations omitted).

Finding a criminal defendant guilty of conspiracy renders him or her liable for the acts of co-conspirators committed in furtherance of the underlying offense where those acts are a reasonably foreseeable consequence of the conspiratorial agreement. *United States v. Pimentel,* 83 F.3d 55, 58 (2d Cir.1996). To sustain a conviction for conspiracy the Government must at least demonstrate that degree of criminal intent necessary to support the underlying substantive offense. *Feola,* 420 U.S. at 686, 95 S.Ct. at 1265; *United States v. Mauro,* 501 F.2d 45, 51 (2d Cir.), *cert. denied,* 419 U.S. 969, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974). In other words, the Government must establish beyond a reasonable doubt that the defendants had the specific intent to violate the substantive statute or statutes. *See United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983); *United States v. Cangiano,* 491 F.2d 906, 909 (2d Cir.), *cert. denied,* 419 U.S. 904, 95 S.Ct. 188, 42 L.Ed.2d 149 (1974). A defendant's mere presence, even coupled with the knowledge that a crime was being committed, is not sufficient to establish a conspiracy. *Soto,* 716 F.2d at 991. The prosecution is required to show purposeful behavior coupled with

knowledge of the conspiracy. *See id.* at 991–92.

The Government must also establish the existence of an overt act in furtherance of the conspiracy. However, "[a]n overt act need not 'be the substantive crime charged in the indictment as the object of the conspiracy'—nor need it even be a criminal act—in order to support a conspiracy conviction." *United States v. Slocum,* 695 F.2d 650, 654 (2d Cir. 1982), *cert. denied,* 460 U.S. 1015, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983), quoting, *Yates v. United States,* 354 U.S. 298, 334, 77 S.Ct. 1064, 1084–85, 1 L.Ed.2d 1356 (1957). The reason for the overt act requirement is simply to manifest that the conspiracy is at work—it is neither resting solely in the minds of the conspirators, nor is it a fully completed operation no longer in existence. *Yates,* 354 U.S. at 334, 77 S.Ct. at 1084–85.

There must also be at least two actors. Until the middle of this century, a husband and wife could not be found guilty of conspiring together. "The husband and wife were one person at law, with but one will between them, namely, that of the husband, and one person could not be charged with conspiring with himself." Anne M. Coughlin, *Excusing Women,* 82 Cal. L.Rev. 1, 93 n. 169 (1994); *see Dawson v. United States,* 10 F.2d 106 (9th Cir.), *cert. denied,* 271 U.S. 687, 46 S.Ct. 638, 70 L.Ed. 1152 (1926). However, since 1960 it is settled law that a husband and wife are legally capable of conspiring to commit an offense. As the Supreme Court stated:

> an immunity to husband and wife as a pair of conspirators would have to attribute to Congress one of two assumptions: either that responsibility of husband and wife for joint participation in a criminal enterprise would make for marital disharmony, or that a wife must be presumed to act under a coercive influence of her husband and, therefore, cannot be willing participant. The former assumption is unnourished by sense; the latter implies a view of American womanhood offensive to the ethos of our society.

*United States v. Dege,* 364 U.S. 51, 52–53, 80 S.Ct. 1589, 1590–91, 4 L.Ed.2d 1563 (1960).

The defendants maintain that the Government failed to present sufficient evidence of a criminal conspiracy to support the jury's verdict. Consistent with this argument, astute counsel for the defendants point to the fact that the Court itself characterized the evidence at trial in support of this count as "very thin" and "weak." Tr. 2953, 2959. Indeed the Court went so far as to note that the prosecution has presented "no direct evidence" to support this count. Tr. 2959. Such a determination does not end the inquiry however. As stated above, the Court must now consider the circumstantial evidence adduced by the Government.

The testimony and exhibits admitted at trial, as considered in the light most favorable to the Government, demonstrate the following facts. Stuart Somerstein is the President of Somerstein Caterers and Marianna Somerstein is the vice president. Both are active participants in all aspects of the business, both the financial and catering phases. Stuart and Marianna were in total command of the Somerstein catering operation. They were the "bosses" in control of every aspect of the business, including the reporting and payment of employee contributions to the Benefit Funds. Bromley was a bookkeeper and Iacovetti was the manager, but both took their orders from the Somersteins. There is evidence that the remittance reports containing false statements were sent out under their direction.

In addition, both defendants were authorized to sign company checks, Tr. 2789, 2790, and they were both present at a meeting with the union in January 1993—although Marianna was only there for a portion of the meeting—to discuss compliance with the requirements of the present collective bargaining agreement. Tr. 2015–20. This agreement includes SCLI's duty to make contributions to the HEREIU benefit funds. *See* Gov. Ex. 2, 3, 4.

Stuart was responsible for overseeing the company's bank accounts and deciding which bills to pay. Tr. 1190–92. He signed the collective bargaining agreements, *see, e.g.,* Gov. Ex. 3, and was responsible for hiring and firing the manager of the catering operation. Tr. 565, 1138. With respect to management of the employees, he was sufficient-

ly involved with employment matters to sign checks payable to the Funds, Tr. 2790–91, and advise the manager that he preferred that the waitstaff be "clean cut." Tr. 1142. Stuart Somerstein also made efforts to discourage new employees from joining the union. *Id.* According to Peter Levin and Kevin Brant, the auditors for the Benefit Funds, Sylvia Bromley advised them that a review of the company records had to be scheduled when Stuart would be present and that all questions should be directed to him. Tr. 678–81, 833–34, 1716, 1731.

Marianna was responsible for handling the contracts with the clients, receiving payments from the clients, and handling the details of the catered events. *See* Tr. 1236, 1243, 1438, 1517. According to Robert Kanowitz, SCLI's former manager, Mrs. Somerstein was heavily involved in the details of each party:

> Q Now, is it fair to say that Mrs. Somerstein's concerns when you were working there was that the party be run efficiently and well?
>
> \* \* \* \* \* \*
>
> Was it the—she is the kind of person if she saw a dirty dish or dirty tablecloth, she would pick it up herself and carry it into the kitchen herself rather than have anybody else do it?
>
> A That is correct.
>
> Q And is it fair to say she was a stickler for detail?
>
> A Yes.

Tr. 1517–18. Similarly, later in the trial, Kanowitz testified:

> Q Although Stuart and Marianna Somerstein may not necessarily have been at the catering hall, how would you describe their management technique?
>
> \* \* \* \* \* \*
>
> A Mrs. Somerstein always cared a great deal about the business. She cared about the client. She was always a stickler for detail of the operation. She always wanted to make sure that the customer was being taken care of and

the food was right. And the customer was always happy.

Tr. 1690.

In addition, Marianna was responsible for staffing the parties, including determining how many union and nonunion waitstaff were hired. Tr. 588–90, 593, 1677; Gov. Ex. 44(i). Drawing all reasonable inferences in favor of the Government, as is required at this stage of the proceedings, the evidence showed that Marianna would only hire a part of her waitstaff from the Union despite the fact that, according to Mary Myhre, the Local 100's dispatcher in "approximately" 1991 or 1992, the Union was almost always able to satisfy employers' staffing requirements. Tr. 2401–04. Marianna also signed checks payable to the HEREIU Funds. Tr. 2789–91.

As part of its records, Somerstein Caterers maintained two sign-in sheets for each party. These sign-in sheets were then later used to fill in the remittance reports. Tr. 1134. One sheet was a list of the union waitstaff that worked at the party and the other was for nonunion personnel. Along with Sylvia Bromley, there is evidence that Marianna oversaw the use of the sign-in sheets and remittance reports by the manager and ensured that they were being maintained correctly. Tr. 605, 1134–35. As Kanowitz testified with respect to maintenance of the remittance reports:

> Q Could you tell us, when were the remittance forms prepared?
>
> A When I was there I would fill them out either at the end of the shift or no later than the end of the weekend. Most of the time it was done for all the parties at Sunday evening, late after the party had ended, before I went home, sometimes 2:00, 3:00 in the morning.
>
> Q How did you fill them out? Where did you get the information to fill them out?
>
> A From the payroll waiter sign-in sheets filled out by the waiters and the bartenders.
>
> Q When you first started at Somerstein Caterers and filled out the remittance

forms, whose names did you place on the remittance forms?

A  In the beginning when I first came there I would put all the waiters and the bartenders for I guess the first two or three parties.

\*　　\*　　\*　　\*　　\*　　\*

Q  When you filled out these remittance forms, Mr. Kanowitz, the first three times when you put everybody on it, did anything happen?

A  Yes, to the best of my knowledge after the third form that I filled out, I was told that I was doing them incorrectly.

Q  Who told you this?

A  Sylvia Bromley and then Mrs. Somerstein.

Tr. 1133–35; see Tr. 1679–80.

Considering the totality of this evidence in the light most favorable to the prosecution, the Court finds that the Government has presented sufficient evidence to sustain the conspiracy conviction. As set forth above, the testimony and exhibits offered by the Government demonstrate that Somerstein Caterers systematically failed to make contributions for union employees, as required by the collective bargaining agreements, either by underreporting the amount of work performed by an employee or by failing to send in reports for hundreds of catered parties. *See* Gov. Ex. 114, 114A, 115, 115A, 116, 116A, 304, 305.

The agreement by the defendants to achieve this unlawful objective may be reasonably inferred from the totality of the evidence. Somerstein Caterers was managed and operated solely by both of the defendants. These reports could not have been sent without their consent and approval. Stuart was in charge of the finances. Marianna was responsible for all of the details of the catered events, Tr. 1517–18, 1690, 1700–01, including determining how many union waiters and bartenders were to be hired for each party. Tr. 588–90, 1677. The defendants worked together to operate Somerstein Caterers and to supervise the preparation and mailing of remittance reports containing false statements. In the Court's view, this evidence is sufficient to demonstrate both a tacit agreement between the Somersteins to commit the offense, namely to defraud the Benefit Funds by sending false remittance reports, and the specific intent necessary to attain that objective. The underreporting of contributions owed in the form of false remittance reports constitutes the necessary overt acts in furtherance of the scheme. Accordingly, the defendants' motions for a judgment of acquittal as to the conspiracy conviction are denied.

### 4.  *Theft or embezzlement*

A charge of embezzlement from an employee benefit fund, which applies only to the defendant Stuart Somerstein, is governed by 18 U.S.C. § 664 which provides:

> Any person who embezzles, steals, or unlawfully and wilfully abstracts or converts to his own use or to the use of another, any moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

\*　　\*　　\*　　\*　　\*　　\*

18 U.S.C. § 664. "The legislative history of Section 664 clearly indicates that its intended purpose was to preserve welfare funds for the protection of those entitled to their benefits." *United States v. Santiago*, 528 F.2d 1130, 1133 (2d Cir.), *cert. denied*, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976), citing, H.R.Rep. No. 87–998 (1961), *reprinted in* 1962 U.S.C.C.A.N. 1532. This important public policy purpose is the underlying momentum for the enactment of section 664.

■■  Section 664 requires a showing of fraudulent intent to sustain a conviction. *United States v. Andreen*, 628 F.2d 1236 (9th Cir.1980); *Young v. West Coast Indus. Relations Ass'n*, 763 F.Supp. 64, 74 (D.Del. 1991), *aff'd*, 961 F.2d 1570 (3d Cir.1992). In *United States v. Snyder*, 668 F.2d 686 (2d Cir.), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982), the Second Circuit recognized that "[t]he only real question ... was whether [the defendant] took [the funds] with the requisite criminal in-

tent." *Id.* at 690. The district court charged the jury:

> that in order to convict they had to be convinced beyond a reasonable doubt that defendant "was aware" that he was receiving money "to which he was not entitled and knowing that, ... deliberately ... appropriated the money for his own use." The court also instructed the jury to consider whether appellant had a good faith belief that the [funds at issue] were authorized or would have been ratified by the trustees, *United States v. Santiago,* 528 F.2d 1130, 1133–34 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *cf. United States v. Ottley,* 509 F.2d 667 (2d Cir.1975), and cautioned that the government could overcome evidence of appellant's good faith belief only by a proof of a criminal intent beyond a reasonable doubt.

*Snyder,* 668 F.2d at 690–91. Section 664 applies to cases involving unlawful loans as well as outright theft. *See United States v. Wuagneux,* 683 F.2d 1343 (11th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983) (affirming conviction for violation of 18 U.S.C. § 664 based, in part, on loans made in furtherance of a fraudulent scheme).

In addition, the Second circuit has recognized that:

> The phrase "to his own use" is a carry over from the common-law pleading in trover, and does not require a showing that the misappropriation was for the personal advantage of the defendant. One's disposition of the property of another, without right, as if it were his own, is conversion to one's own use. Conversion to one's own use means simply not to the use of the entruster.

*Santiago,* 528 F.2d at 1135.

Consistent with this interpretation, the Seventh Circuit has recognized that to sustain a conviction, the perpetrator's intent need only be to appropriate the property at issue; the simultaneous intent to return the property does not "render the offense any less [of an] embezzlement." *United States v. Waronek,* 582 F.2d 1158, 1161 n. 4 (7th Cir. 1978).

According to Stuart, the embezzlement conviction should be set aside because the prosecution failed to prove the requisite criminal intent. Again, the Court disagrees.

As set forth above, in 1980 Somerstein Caterers established the Private Pension Plan, governed by ERISA, for employees not covered by the collective bargaining agreements. *See* Tr. 2585–87; Gov. Ex. 138, 138A (summary plan description and plan document). Stuart was a plan trustee. Tr. 2587, 2597. According to the terms of the plan, a trustee is prohibited from engaging in "lending of money or other extension of credit between the Trust and a party-in-interest." *See* Gov. Ex. 138A, § 16:16. As a trustee, Stuart is also a party-in-interest, Tr. 2552–53, as is SCLI as the "employer who sponsors the plan." Tr. 2551. According to Charles Edelstein, the ERISA expert from the Pension and Welfare Benefits Administration of the United States Department of Labor, "[s]ales, leases, loans, [or] virtually any financial transaction between a plan and a party in interest [constitutes] a prohibited transaction." Tr. 2552.

On June 2, 1993, Stuart caused SCLI to take a loan in the amount of $135,000 from the Private Pension Plan. Tr. 2597–98. On October 19, 1993, he caused SCLI to borrow another $20,000 from the plan. Tr. 2598–99. These loans were made based on unsecured demand promissory notes made in Stuart's handwriting.

According to Morris Glickman, the actuary hired by SCLI to maintain the Private Pension Plan, such loans constituted prohibited transactions under ERISA. Tr. 2599. In a phone conversation in 1994, and at meetings in February and March 1995, Glickman advised Stuart on three occasions that these transactions were unlawful and that the money should be returned. Tr. 2599–2601. Specifically, Morris Glickman, Somerstein's own actuary testified as follows:

Q Did there come a time that you spoke to Stuart Somerstein about this loan?

A Yes.

Q Can you tell us approximately when that took place?

A  Again, sometime in 1994.

Q  Was it in person or over the phone?

A  The phone.

Q  Do you remember to the best of your recollection what you said to him and he said to you?

A  I remember what I said, and that was that I told Mr. Somerstein that that transaction was prohibited, and that it had to be paid back immediately.

\*   \*   \*   \*   \*   \*

Q  Did there come a time that you met again with Stuart Somerstein?

A  Yes.

\*   \*   \*   \*   \*   \*

Q  I am going to show you Government's Exhibit 98. And ask you to take a look at that to see if that refreshes your recollection as to when in 1995 the second meeting took place.
   (Handed to the witness.)

A  Yes. This is March—it looks like March 12th.

\*   \*   \*   \*   \*   \*

Q  During this second meeting in March of 1995, what was discussed?

A  Again, it was a continuation of the prior meeting. Again, the thrust of the changing of the plan. We had done our calculations to present to everybody there to try to come up with a viable solution to the problems. And at that meeting it was determined to freeze the pension plan.
   In addition to that, also we brought up the fact of the loan.

Q  This was the third time then that you had discuss the—discussed the loan with Stuart Somerstein; is that correct?

A  Yes.

Q  And what was discussed with regard to the loan this time?

A  That it needed to be paid back.

Q  Do you remember what, if anything Stuart Somerstein responded when this discussion started?

A  I don't recall.

Q  Do you know whether or not there has been any repayment of the loan?

A  As far as I know there hasn't up through October 31st, '95. I have no idea subsequent to that.

Tr. 2599, 2600, 2605–07.

In passing, the Court notes that, according to the testimony of Nicholas J. Zolotas, the comptroller of the Water's Edge Restaurant and Somerstein Caterers, there is still unpaid on the loans the sum of $115,000 as of October 31, 1996. Tr. 3018.

The Court further notes that even with the deposit of the funds loaned from the Private Pension Plan, there was a deficit in the Somerstein Catering bank account in the sum of $10,098.07. Tr. 3022.

In 1993, the year the loans were made, there were $56,229 in contributions owed to the plan. Tr. 2604; Gov. Ex. 88. At the time of the 1995 meeting with Glickman, SCLI owed $42,199 in contributions to the plan, and different options such as freezing the plan—preserving the assets as of the time of the freeze without increasing the benefits—or terminating the plan, were being considered. Tr. 2601–03. The Court does note however, that at the time that the plan was eventually frozen, the required contributions were up to date. Tr. 2630.

In addition, Cynthia Gamble, an Internal Revenue Service pension specialist, testified that these prohibited transactions, namely the two 1993 loans, should have been reported on SCLI's IRS Form 5500 in 1994. Tr. 2494. Despite this requirement, these documents do not reflect the two "loan" transactions. Tr. 2494–96.

In the Court's view, this evidence is sufficient to sustain a conviction for violating section 664, beyond a reasonable doubt. A reasonable jury could have found the essential elements of this crime based on a violation of section 664, beyond a reasonable doubt. As set forth above, in 1993, Stuart Somerstein caused two prohibited transactions to occur between the Private Pension Plan and SCLI. Both of these entities were entirely within his control. He himself caused and created these prohibited transactions. The loans occurred at a time when the

pension plan was underfunded by more than $50,000. Further, Stuart failed to report these transactions to the IRS, and they were not repaid, contrary to the advice of SCLI's own professional actuary, who expressly advised him that the loans transactions were unlawful.

Accordingly, Stuart's motion for a judgment of acquittal with respect to Count IV, based on insufficiency of the evidence pursuant to Fed.R.Crim.P. 29, is denied.

### D. *Alleged prosecutorial misconduct*

In addition to arguing that the convictions may not stand as the result of insufficient evidence, the defendants contend that they were unfairly prejudiced as the result of the Government's misconduct at the trial. When evaluating whether prosecutorial error has resulted in denying a defendant a fair trial, the court must consider: (1) the severity of any misconduct; (2) the measures taken to cure the effects of the misconduct; and (3) the likely effect that the misconduct had on the outcome of the trial. *United States v. Forlorma*, 94 F.3d 91, 95 (2d Cir.1996); *United States v. Russo*, 74 F.3d 1383, 1396 (2d Cir.1996); *United States v. Valentine*, 820 F.2d 565, 570 (2d Cir.1987).

Initially, the Somersteins argue that the prosecution wrongfully sent into the jury room Government's Exhibit 120, without redaction, in contravention of this Court's prior order. In addition, Marianna maintains that the prosecution committed reversible error by introducing evidence of allegedly delinquent contributions with respect to nonunion employees, solely to inflame the jury, knowing that such evidence could never lead to a conviction. Further, she asserts that during summation, the Government argued that the jury should use a bank statement, a signed bank agreement and signature cards in support of a guilty verdict against her, when those documents were only admitted with regard to the embezzlement charge against her husband. Finally, Marianna contends that the Government wrongly broadened the scope of the indictment by directing the jury to consider certain correspondence with the Union, a third party non-victim of the alleged crimes, as evidence of an intent to defraud the Benefit Funds.

#### 1. *Government exhibit 120*

■ At the close of the Government's case, the Court dismissed those portions of the indictment based on the defendants' alleged failure to make contributions for non-union employees. This decision was based on the Court's determination that the Government was unable to prove any fraudulent intent with respect to these workers. Tr. 2958–59. According to the defendants, the Government nevertheless "knowingly sent into the juryroom unfair and highly damaging evidence that the Court had expressly precluded it from arguing in summation: a large color, summary chart—GX 120—which contained clearly irrelevant and highly prejudicial information with respect to the government's nonunion theory that the Court had expressly ordered 'out of the case.'" Stuart Somerstein Mem. of Law at 19.

While the Court agrees that the chart should have been redacted to focus solely on the failure to pay contributions for union employees, such error does not rise to the level of misconduct sufficient to set aside the verdict. Initially, the Court notes that defense counsel were aware that if Government's Exhibit 120 was going to be sent into the jury, it had to be redacted. The record reflects that counsel for the parties extensively discussed the status of the exhibits to be sent into the jury. *See* Tr. 3600–17. Before the exhibits were delivered to the jury, the Court gave defense counsel a final opportunity to review such exhibits:

THE COURT: One representative from each side give [the exhibits] to the marshals with courtroom deputy clerk.

(Whereupon, at this time there was a pause in the proceedings.)

THE COURT: Counsel, so I can get on with other business, what is left that has not been sent in?

MS. WARD: We are sending in the government exhibit cart with the boxes.

THE COURT: Is that agreeable, Mr. Newman, before you leave?

MR. NEWMAN: Yes, sir.

THE COURT: Mr. Stillman, is that agreeable to send in the rest of these exhibits?

MR. STILLMAN: Yes, sir.

THE COURT: Mr. Bergman?

MR. BERGMAN: We agree.

THE COURT: All right. Let's send them in.

(Exhibits delivered to the jury.)

MR. STILLMAN: Mission accomplished.

Tr. 3616–17. Clearly, all counsel reviewed the exhibits or had an opportunity to review the exhibits to be sent into the jury deliberation room, and all counsel agreed on the exhibits that were delivered to the jury.

Further, and equally significant, the information contained in this chart had already been seen by the jury during the trial. Indeed, virtually all of the Government's evidence presented during the trial contained information relating to both union and nonunion employees. *See, e.g.*, Tr. 319, 353–55, 754, 784–85, 1020–21, 1024, 1680. The Court did not dismiss the Government's case with respect to the nonunion employees until after the prosecution rested. Tr. 2958–59. The Court then gave the following curative charge:

> You are not to consider any of the evidence of failure to pay contributions to any Benefit Funds of HEREIU or the Local Benefit Funds as to the nonunion employees of Somerstein [Caterers].
>
> The failure to pay such contributions for nonunion employees is not to be considered by you in any way with regard to your decisions on the four counts of the indictment.

Tr. 3323. In addition, in its charge, the Court again instructed the jury at length and in detail, to disregard any evidence with respect to the nonunion employees:

> Initially, as I advised you previously, I instruct you that all the Charges against the defendants based on an alleged failure to report contributions for non-union employees of Somerstein Caterers, Inc. are no longer before you. You are not to consider any evidence of failure to pay contributions to any of the benefit funds of HEREIU or the Local 100 Benefit Funds as to the non-union employees of Somer-

stein. The failure to pay such contributions for non-union employees is not to be considered by you in any way with regard to your decisions on the four counts in this indictment.

> Also, please do not speculate as to the reasons for this determination.

> The effects of this ruling are that I have stricken portions of the indictment. Also, certain exhibits and charts, previously placed in evidence, have been removed from your consideration.

> In addition, your evaluation of the testimony of some of the witnesses must also be revised in the following manner: you must not draw any adverse inference against any of the defendants either because the names of the non-union waiters bartenders and captains were not transferred from the sign-in sheets to the remittance reports or that, as a consequence, the benefit funds were never advised in the remittance reports that those non-union employees worked at Somerstein Caterers. Similarly, you must not draw any adverse inference against the defendants because Somerstein Caterers employed non-union waiters, bartenders and captains to staff the affairs at Temple Israel.

> No inference of criminality, in any respect, can be drawn by you from these matters that I have just discussed with you.

> This means that the central, factual issues for your consideration, with respect to the so-called remittance reports, will be whether there was an under-reporting or a failure to report by the defendants to the union benefit funds of *union* waiters, *union* bartenders and *union* captains, and/or a failure to report the number of affairs that were worked by *union* waiters, bartenders and captains.

This instruction was given to the jury orally during the charge, and in the written charge sent into the jury deliberation room.

In the Court's view, these repeated curative instructions regarding this evidence were sufficient to warn the jury with regard to the nonunion employees. As a result, the information regarding nonunion employees

contained in Government Exhibit 120, which was inadvertently sent to the jury, without objection by defense counsel constitutes, at best, harmless error. Based on the totality of these circumstances, the Court finds with reasonable certainty, that the fact that Government's Exhibit 120 was sent into the jury room could not have altered the outcome of the trial.

Finally on this subject, the Court makes one additional finding. In support of his argument regarding prosecutorial misconduct, counsel for Stuart Somerstein relies on then District Judge Leval's decision in *Red Star Towing v. "Ming Giant"*, 552 F.Supp. 367 (S.D.N.Y.1982), *modified on other grounds*, 563 F.Supp. 224 (S.D.N.Y.1983). In *Red Star Towing*, plaintiff's counsel permitted an exhibit to go to the jury despite the Court's instructions to the contrary. Judge Leval found that the attorney's conduct constituted "willful misconduct" and referred the matter to Committee on Grievances of the Board of Judges of the Southern District of New York.

The Court finds that the circumstances in this case are totally different from those in *Red Star Towing*. The Court finds that the delivery of the unredacted exhibit was the result of inadvertence. The Court further finds that Assistant United States Attorney Laura A. Ward faced with formidable opposition by three outstanding and experienced defense counsel, conducted herself not only with great competence, but in a most professional and ethical manner prior to and during the trial.

### 2. *The prosection's other alleged efforts to inflame the jury*

■ In addition to Government Exhibit 120, Marianna Somerstein raises several other instances of alleged prosecutorial misconduct which prejudiced her defense. Initially, she contends that the prosecution's theory based on the defendants' failure to pay contributions for nonunion employees was so untenable, that the supporting evidence presented to the jury denied her a fair trial. Again, the Court disagrees.

Although there was insufficient evidence to support a conviction based on the Somersteins' allegedly deceptive efforts to avoid paying contributions for nonunion employees, the admission of this evidence did not constitute the denial of a fair trial. Although there was evidence adduced at trial that the defendants failed to pay benefits for nonunion employees, there was also evidence introduced by the Government that there was no clear language in the collective bargaining agreements which would advise an employer as to whether nonunion employees were actually covered by the HEREIU benefit plans. *See* Tr. 353–55. In addition, there was evidence introduced that the defendants openly and expressly maintained that Somerstein Caterers had no obligation to pay for nonunion employees. In the Court's view, such evidence was not prejudicial to the defendants. Moreover, the testimony given by nonunion employees, which Marianna contends was designed solely to elicit jury sympathy, was relatively limited and was accompanied by clear evidence of the lack of any express agreement to pay contributions for such employees and the defendants' clear position that they had no such obligation. Finally, as set forth above, on two occasions the jury was given a clear curative instruction to disregard such evidence.

■ Marianna Somerstein also contends that the prosecution's rebuttal summation was prejudicial. She states that twice during the rebuttal summation, the prosecutor wrongly referred to a 1993 bank account statement, a signed bank agreement and bank signature cards, as to which evidence there was a stipulation that it was offered with regard to the embezzlement count against Stuart Somerstein only.

The Court notes that with respect to the reference to the bank account statement, defense counsel made a timely objection which the Court sustained. Tr. 3486. A curative instruction was then given. This was sufficient to eliminate any possible prejudice to the defendant.

■ Further, in the Court's view, the Government's reference to Marianna's signatures on exhibits admissible only against her husband also constitutes harmless error. The prosecutor's invitation for the jury to consider these exhibits when reviewing the

 

charges against Marianna was a response to defense counsel's argument that her signature[s] on certain other documents were nothing more than a "quick scrawl," essentially implying that she did not understand what she was signing. The Court doubts that a signature comparison using exhibits inadmissible against Marianna was of any consequence where there were other documents bearing her signature which were also readily accessible. In the Court's view, such a statement, made in a rebuttal summation, does not rise to such a level as to warrant a reversal of her convictions.

■ Marianna also assails the Government's summation by contending that the prosecution "argued an improper theory of ... involvement in the alleged conspiracy." Marianna Somerstein Mem. of Law at 21. In summation, the Government asserted that by ordering fewer union waiters she deprived the Funds of contributions that would have been owed had additional union employees been hired. According to the defendant, such a scheme unlawfully widened the scope of the indictment because it depicted an effort to defraud the union, rather than the Funds. While ordering less union waitstaff might lessen contributions, it would constitute neither mail fraud nor the filing of false statements.

Although the Court appreciates the facial appeal of this argument, it does not constitute a ground to set aside the verdict. Ordering fewer union waiters would not operate directly to defraud the HEREIU Benefit Funds. However, this argument by the prosecutor does not constitute an improper enlargement of the indictment or an improper theory of involvement in the alleged conspiracy.

Finally, the Somersteins also move in the alternative for a new trial. Such a motion is guided by a lower standard, which permits the Court to exercise its discretion "in the interests of justice" when reviewing the adequacy of the evidence. *See Tibbs,* 457 U.S. at 38, 102 S.Ct. at 2216. Nevertheless, the Court declines to order a new trial. Based on the evidence adduced at trial, some of which has been set forth above in detail by the Court, in the Court's view, a reasonable jury could have concluded that the Government proved its case as to all counts against both defendants, beyond a reasonable doubt. As a result, an exercise of discretion to overrule the jury's verdict is unwarranted. Accordingly, the defendants' motion for a new trial pursuant to Fed.R.Crim.P. 33 is denied.

### III. *Conclusion*

Having reviewed the parties' submissions and heard oral argument, and for the reasons set forth above, it is hereby

ORDERED, that the motions of the defendants Stuart Somerstein and Marianna Somerstein for a judgment of acquittal pursuant to Fed.R.Crim.P. 29, or, in the alternative, for a new trial, pursuant to Fed.R.Crim.P. 33, are denied.

SO ORDERED.